BILLIE DERRINGER, Plaintiff-Appellee, *v.* ILLINOIS CIVIL SERVICE COMMISSION *et al.*, Defendants-Appellants.

Fifth District   No. 78-106

Opinion filed December 6, 1978.

William J. Scott, Attorney General, of Chicago (Russell C. Grimes, Jr., Assistant Attorney General, of counsel), for appellants.

Nehrt, Sachtleben & Fisher, of Chester (Edward J. Fisher and David R. Smith, of counsel), for appellee.

Mr. JUSTICE KUNCE delivered the opinion of the court:

Plaintiff-appellee Billie Derringer, an assistant warden in the State correctional system, appealed his transfer from the Menard Correctional Center to the Joliet Correctional Center, maintaining before the Civil Service Commission that the transfer was politically motivated. After a hearing, the Commission upheld the transfer. On administrative review, the Circuit Court of Randolph County found that the Commission's decision was against the manifest weight of the evidence and ordered that Derringer be reinstated to his former position at Menard. The Civil Service Commission and the Department of Corrections have appealed to this court.

■■ It is not disputed, nor do we doubt, that a civil service employee cannot legally be transferred involuntarily from one geographical location to another for merely capricious or political reasons. Our courts have so held with regard to the *discharge* of civil servants, and the logic of those decisions extends to geographical transfers. (*Hacker v. Myers*, 33 Ill. App. 2d 322, 179 N.E.2d 404 (1st Dist. 1961); *Burke v. Civil Service Com.*, 41 Ill. App. 2d 446, 190 N.E.2d 841 (3d Dist. 1963); see also *Farny v. Civil Service Com.*, 10 Ill. App. 3d 80, 293 N.E.2d 450 (4th Dist. 1973).) As the hearing officer in the instant case recognized, a geographical transfer for partisan political purposes is clearly contrary to the stated aim of our Personnel Code, to achieve a system of personnel administration "based on merit principles and scientific methods." Ill. Rev. Stat. 1977, ch. 127, par. 63b102.

■■ Section 11.01 of article XI of the Rules of the Civil Service Commission provides that an employee who appeals his geographical transfer to the Commission "shall have the burden of introducing sufficient, competent, and credible evidence showing that the transfer was unreasonable, unjust, or capricious and was not a bona fide attempt to serve the best interests of the operating agency." An involuntary geographical transfer based on political expediency is by its very nature unjust to the employee involved and not a good faith attempt to serve the best interests of the agency. Thus if a civil service employee can prove by a preponderance of the competent and credible evidence that his transfer

was politically motivated, he has met his burden of proof, and his appeal should be allowed.

Appellants here rely heavily on the well-settled rule that a reviewing court should reverse the findings of an administrative agency only when they are against the manifest weight of the evidence. We are, of course, mindful of that rule. It does not require, however, that our stamp of approval must be placed on the decision of an administrative agency merely because the agency's hearing officer heard the witnesses and made the requisite findings. (*Brown Shoe Co. v. Gordon*, 405 Ill. 384, 91 N.E.2d 381 (1950); *Burke v. Civil Service Com.*, 41 Ill. App. 2d 446, 190 N.E.2d 841 (3d Dist. 1963).) Our duty in an administrative review case is precisely the same as that of the circuit court: to examine the entire record in order to ascertain whether or not the findings and decision of the administrative agency are against the manifest weight of the evidence. (*Berwyn Savings & Loan Association v. Illinois Savings & Loan Board*, 29 Ill. App. 3d 965, 331 N.E.2d 254 (1st Dist. 1975); *Smith v. O'Keefe*, 9 Ill. App. 3d 814, 293 N.E.2d 142 (5th Dist. 1973); *Mitchell v. Sackett*, 27 Ill. App. 2d 335, 169 N.E.2d 833 (1st Dist. 1960).) Where an administrative order is contrary to the manifest weight of the evidence, it is the duty of the appellate court to affirm the action of the circuit court in setting the order aside, *Gloss v. Board of Trustees*, 132 Ill. App. 2d 736, 270 N.E.2d 472 (1st Dist. 1971).

It is true, as appellants assert, that innumerable decisions of our courts recite that it is not the proper function of a court to reweigh the evidence previously presented to an administrative decision-maker. (See, *e.g., Board of Education v. Scott*, 105 Ill. App. 2d 192, 244 N.E.2d 821 (4th Dist. 1969).) But we could not perform our reviewing function at all without weighing the evidence. The distinction is that we do not reweigh the evidence as we would if we were the original decision-maker, attempting to decide in the first instance whether the party with the burden of proof has proved the material elements of his case by the preponderance of the evidence. Our weighing is done on different scales; our function is merely to decide whether the manifest weight of the evidence of record favors the party who did not prevail before the agency. If it does not, we must affirm, even if we think that the preponderance of the evidence is to the contrary. But if, after a review of all the evidence, we think it evident that the administrative decision was wrong, it is our duty to reverse.

With these considerations in mind, we turn to the evidence from which the hearing officer in this case concluded that Derringer had failed to meet his burden of proof.

Billie Derringer testified that he had worked at Menard since 1959 and had lived in the same home in the Chester area for 16 years. He was 54 years old. He had been reluctant to accept the promotion to assistant

warden that he was offered in 1976 because he thought it would necessitate his living on State property at the institution. He only accepted the post after Mr. Rowe, the acting director of the Department of Corrections, assured him that that would not be necessary and that he could continue to live in his home. On June 2, 1977, he was summoned to Rowe's office in Springfield. Despite Derringer's protests, Rowe informed him that more security personnel were needed at Joliet and that he was to be transferred there, some 325 miles from his home. On June 8 he was told to report to Joliet on June 10. He never received any written transfer order. The transfer was a lateral one—that is, his pay and duties were the same as they had been at Menard. The transfer worked a hardship upon him because of the home he owned in the Chester area and because he was an outpatient at a hospital in St. Louis. His wife was also under medical care in Chester.

Ernest Morris, the warden at Menard when Derringer's transfer took place, testified that he did not participate in any way in the decision to transfer Derringer to Joliet. He never received any written notification of the transfer, was never consulted by the Department of Corrections or the Governor's office about the move, and was never given a reason for it.

Ralph Dunn, State Representative for the 58th District where Menard Correctional Center is located, was subpoenaed by plaintiff to testify. Pursuant to subpoena, Dunn produced a letter he had written to Governor Thompson on April 1, 1977, a contemporaneous press release, and a press release dated June 10, 1977. The handwritten letter referred to Dunn's previous communications with Governor Thompson about "doing something about Menard" and stated "I will appreciate it very much if you will follow through and change Rowe, Morris and Derringer."

The press release, which was also sent to the governor, stated that Dunn had asked Thompson to fire or transfer Charles Rowe, the acting director of the Department of Corrections, and Warden Ernest Morris and Assistant Warden Derringer at Menard. The release quoted Dunn as saying:

"Problems at Menard have been one of my chief concerns * * * and Thompson has done nothing about all the problems created by the Walker administration.

I fully realize that the Governor has only been in office three months but we're long past the time that the Walker appointees who have been destroying prison moral [sic] should be removed.

Residents of my district are in constant fear of escapees, riots and loss of life. It's time some changes were made and there's no better place to start than at the top with the Walker men—Rowe, Morris and Derringer."

Dunn had spoken to Governor Thompson about changing personnel at Menard prior to the letter and press release in April. When he later saw the governor at a social function, the governor told him not to worry. Dunn testified that he did not have anything personally against Derringer and that he named him in the press release and the letter only because Derringer was second in command at Menard, and Dunn thought a change was needed. He maintained that his motivation was the result of concern for the people of his district. He knew that Derringer was a Democrat and that Derringer's replacement was a Republican, like Dunn himself and Governor Thompson.

Immediately after the transfer of Derringer and Warden Morris in June, Dunn issued another press release which praised the changes and quoted Dunn as stating: "I've been a long time watchdog of the problems at Menard, and nothing was ever done about them under the administration of Morris or his boss Daniel Walker."

Gayle Franzen, the special assistant to the governor for law enforcement and corrections, testified that he had served as liaison between the governor's office and the Department of Corrections since March 1, 1977, when he came to Illinois from the State of Washington. On May 5, 1977, after speaking with Representative Dunn, he attended a meeting with local Republican politicians in Chester. They indicated to him their desire to place Republicans in positions at Menard. The possible transfers of personnel from Menard was an important reason for his trip to Chester. On May 6, 1977, he had a conversation with a group of Menard employees. Dunn's press release was discussed, and the employees wanted to know if the warden and Derringer were going to be fired or transferred. He told the employees that one of his reasons for being there was because of political pressure being applied by local Republicans. Franzen testified that political pressure was not the sole reason for Derringer's transfer, that Rowe made the decision, and that Franzen never told Rowe to transfer Derringer. Franzen knew that Derringer would not want to be transferred. The transfer was a result of a staff shakeup at the Stateville institution which necessitated filling certain positions with people from other institutions. Fourteen or 15 people were affected by the shakeup.

David Turner, the internal affairs lieutenant at Menard, was one of the staff members who attended the meeting with Franzen. He testified that he asked Franzen if his presence there had to do with the transfer of the warden and Derringer. Franzen answered that he was there because of political pressure that had been put on the governor's office.

Charles J. Rowe testified that he had been appointed acting director of the Department of Corrections by Governor Walker in August 1976,

and then reappointed by Governor Thompson on January 10, 1977. He testified at length about the changes in personnel necessitated by the situation at Stateville. He made the decision to transfer Derringer to Joliet because he thought he was "tops" for the position. Representative Dunn did not communicate with him about the transfer, although the governor's office, through Franzen, did ask him about Dunn's press release, and Governor Thompson remarked to him on one occasion that he was "taking some heat on Menard." The governor never told Rowe to transfer Derringer. There were some 700 security personnel in the Department of Corrections within a 35-mile radius of Joliet. Derringer's geographical transfer was the only one involving a certified civil service employee that was not a promotion. Rowe was confirmed as Director of the Department of Corrections shortly after the transfer.

After a careful review of the entire record, we have concluded that the manifest weight of the evidence presented was contrary to the decision of the Commission. We agree with the court below that the hearing officer appears to have relied almost exclusively on the appellants' witnesses' own interpretations of their actions and ignored what they actually did. It is manifest to us, as it was to the court below, that the transfer of Derringer was "permeated with politics," despite the participants' obvious reluctance to admit that their actions were politically motivated.

■■ The involvement of Dunn and Franzen was exclusively political. Dunn's repeated reference to the "Walker men" at Menard and the fact that Morris and Derringer had not been in their positions at Menard long enough to evaluate their performances objectively, leave little doubt as to Dunn's true motivations. Franzen admitted that the governor was concerned about the political pressure he had been receiving about Democratic employees at Menard, and that was the reason for his trip to the institution and his talk with local Republican political leaders.

Rowe's attempt to characterize the transfer of Derringer as a decision made strictly on merit is singularly unconvincing in light of all the other facts of record: his representation to Derringer only a few months previously that he would not have to leave his home if he accepted the offered promotion; the total lack of consideration for the hardships that the transfer would work on Derringer; the fact that Derringer was the only one of the 14 or 15 employees affected by the changes in the correctional system who had to undergo a lateral geographical transfer; the short notice that was given; the failure to give any written notice; and the fact that there were so many other security employees already stationed close to Joliet.

With all due deference to the factual findings of the administrative agency, we are not constrained to ignore as judges what we know as

men.[1] The circumstances surrounding the sudden, unceremonious uprooting of this long-term employee of the Department of Corrections shortly after the application of intensive political pressure fully rebuts, we think, any presumption that the transfer was a bona fide attempt to serve the best interests of the agency. We therefore affirm the order of the Circuit Court of Randolph County reinstating Billie Derringer to his position at Menard.

Affirmed.

EBERSPACHER, P. J., and G. J. MORAN, J., concur.

---

[1] We note in this connection the suggestion made to us at oral argument by counsel for appellants to the effect that the conversation between the governor and Representative Dunn was irrelevant to the issues before us because politics are not conducted at social functions.